IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| UNITED STATES OF AMERICA | |
|---|---|
| Plaintiff, | |
| v. | No. |
| APPROXIMATELY $5,830,938.13 IN U.S. CURRENCY SEIZED FROM NORTHRIM BANK IN ACCOUNT NUMBER ENDING IN 250 and INVESTMENT ASSETS WITH A VALUE OF APPROXIMATELY $2,716,403.95 SEIZED FROM VANGUARD GROUP, INC., IN ACCOUNT NUMBER ENDING IN 132, | |
| Defendants. | |

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The United States of America, by its attorneys, alleges the following in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## 1   Nature of the Action

1.1   This is a civil action in rem to forfeit property to the United States under the provisions of 18 U.S.C. § 981(a)(1)(C) for violations of 18 U.S.C. § 1347.

## 2   The Defendant *in rem*

2.1   The Defendant Property is U.S. currency and investment assets seized pursuant to seizure warrants served on or about February 26, 2024, specifically:

2.1.1   Approximately $5,830,938.13 in U.S. currency seized from account number

ending in 250 at Northrim Bank, Anchorage, Alaska, seized on or about February 26, 2024 pursuant to civil and criminal Seizure Warrant No. 3:24-mj-00094-KFR; and

2.1.2 Investment assets with a value of approximately $2,716,403.95 seized from account number ending in 132 at the Vanguard Group, Inc., Malvern, Pennsylvania, seized on or about February 26, 2024. pursuant to civil and criminal Seizure Warrant No. 3:24-mj-00095-MMS.

2.1.3 The Defendant Property is located at the above institutions and seized in place pursuant to civil and criminal Seizure Warrants Nos. 3:24-mj-00094-KFR and 3:24-mj-00095-MMS which were executed by the District Court for the District of Alaska, the Honorable Matthew M. Scoble, on February 24, 2024.[1]

## 3   Jurisdiction and Venue

3.1   This Court has subject matter jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

3.2   Venue is proper in this Court under 28 U.S.C. § 1395 because the acts or omissions giving rise to the forfeiture occurred at least in part in the District of Alaska.

## 4   Relevant law

4.1   Under 18 U.S.C. § 981(a)(1)(C), with cross references to 18 U.S.C. §§ 1956(c)(7)

---

[1] The Northrim Bank and Vanguard accounts contain additional assets not subject to the Seizure Warrants.

Case 3:24-cv-00050-SLG   Document 1   Filed 03/01/24   Page 2 of 31

and 1961(1), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" of a health care fraud offense or offenses committed in violation of 18 U.S.C. § 1347 is subject to civil forfeiture to the United States.

4.2    It is a violation of 18 U.S.C. § 1347, Health Care Fraud, to knowingly and willfully execute, or attempt to execute, a scheme or artifice -- (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program -- in connection with the delivery of or payment for health care benefits, items, or services.

4.3    Under 18 U.S.C. § 24(a)(1), a "Federal health care offense" means a violation of, or a criminal conspiracy to violate, among other statutes, 18 U.S.C. § 1347, and under § 24(b), a " 'health care benefit program' means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract."

4.4    Per 18 U.S.C. § 981(a)(2)(A), the term "proceeds" in a case involving health care fraud schemes means "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."

4.5 The Defendant Property is subject to arrest for civil forfeiture if the United States shows probable cause to believe that the underlying health care fraud conduct occurred and that the Defendant Property has a nexus to that offense—namely, that the property is health care fraud proceeds or property traceable to such proceeds. *See* 18 U.S.C. § 981(a)(1)(C). Probable cause means sufficient information to convince a "prudent person ... that there was a fair probability" that the property is subject to forfeiture. *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).

4.6 As set forth herein, there is a fair probability that the Defendant Property is traceable proceeds of a health care fraud scheme.

## 5 Identification of persons, accounts, funds, and other objects.

5.1 Claribel Kohchet-Chua Tan ("Dr. Tan") is a natural person and a resident of Alaska. Dr. Tan is a physician, holding an Alaska Medical Board license, and purporting to specialize in rheumatology, immunology, and osteoporosis. Dr. Tan is the spouse of Daniel Tan.

5.2 Daniel Tan is a natural person and a resident of Alaska.

5.3 The "Tans" refers collectively to Dr. Tan and Daniel Tan.

5.4 CLARIBEL K. TAN, M.D., LLC ("MD LLC") is an Alaska limited liability company. At all relevant times, MD LLC operated a medical clinic at 2401 E. 42nd Ave, #102, Anchorage, AK 99508 (the "Clinic"). Dr. Tan is the sole member and manager of MD LLC.

5.5 According to a witness with personal knowledge, Daniel Tan manages the day-to-day operations of MD LLC while Dr. Tan manages the medical care. The witness

described the control of the clinic and business as "pretty equal" between Dr. Tan and Daniel Tan. They appeared to discuss pretty much everything with each other with respect to the business. The witness was not aware of any other individuals who made decisions regarding the operation of MD LLC. Dr. Tan and Daniel Tan were both involved with the ordering of medications for the Clinic, but Daniel Tan usually ordered the medications.

5.6 Northrim Bank is a bank insured by the Federal Deposit Insurance Corporation (FDIC), and associated with Northrim BanCorp, Inc., an Alaska corporation located in Anchorage, Alaska.

5.7 At all times relevant to this matter, the Tans maintained three accounts relevant to this application at Northrim Bank (collectively, the "Northrim Accounts"). The Northrim Accounts are:

5.7.1 Business checking account with account number ending in 770, opened in 2005 ("Northrim #770"). From 2011 through 2014, nearly all revenue that MD LLC received, and known to law enforcement in this matter, was deposited into Northrim #770.

5.7.2 Business savings account with account number ending in 662, opened in 2010 ("Northrim #662"). From 2011 through 2014, approximately $195,000 in revenue from Veterans Affairs was deposited into Northrim #662. During 2015, some of the revenue MD LLC received was deposited into Northrim #662, but some revenue was deposited into the other two Northrim Accounts; and

5.7.3 Business savings account with account number ending in 250, opened in 2015

("Northrim #250"). From 2016 through August 31, 2023, a majority of revenue that MD LLC received, and known to law enforcement in this matter, was deposited into Northrim #250.

5.7.4   During 2015, the Tans deposited health care insurance reimbursement payments into all three of the Northrim Accounts.

5.8     The Vanguard Group, Inc. ("Vanguard") is an investment management company with headquarters in Pennsylvania. The Tans keep a brokerage account at Vanguard, with account number ending in 132 ("Vanguard #132").

5.9     Collectively, the Northrim Accounts and Vanguard #132 are referred to as the "Target Accounts."

5.10    There are approximately 147 health care benefit programs ("Programs"), as defined in 18 U.S.C. § 24(b), involved in this case. The Programs include: TRICARE, Department of Veterans Affairs, Aetna, Christian Brothers, Cigna, Employee Benefits Management Services, Meritain, Moda Health, Optum/UMR, PBS, Premera, Providence, and the Federal Employees Health Benefits Program.

5.11    "Medical records" refers to paper records purporting to describe the provision of health care services and Subject Medicine to patients, created and maintained by the Tans, and seized by law enforcement during the execution of a search warrant at the Clinic in 2019.

5.12    "Superbill" refers to paper records created and maintained by the Tans to communicate information from the Tans to an agent or subordinate employee at the Clinic regarding how to submit claims (or "bill") Programs, and obtained by law

enforcement through subpoenas or seized by law enforcement during the execution of a search warrant at the Clinic in 2019.

5.13 "Claims" refers to paper and/or electronic communications from the Tans, and/or a Clinic employee or agent, to Programs purporting to truthfully identify health care benefits, items, or services delivered to patients and requesting payment. Law enforcement acquired evidence regarding claims directly from Programs and other business records.

## 6    Summary of health care fraud.

6.1  Object of schemes: The Tans knowingly and willfully executed, and/or attempted to execute, a scheme and/or artifice to defraud any health care benefit program, and/or to obtain by means of false and/or fraudulent pretenses, representations, and/or promises, any of the money or property owned by, and/or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, and/or services, in violation of 18 U.S.C. § 1347.

6.2  Manner of schemes: The Tans submitted, to Programs, fraudulent claims (sometimes referred to as "billing") falsely claiming to have provided health care benefits, items, and/or services to patients.

6.3  The Tans committed health care fraud in violation 18 U.S.C. § 1347 in at least two interrelated schemes, the "Medication Scheme" and the "Prolonged Services Scheme." In both schemes, the Tans obtained, by their false and/or fraudulent pretenses, representations, or promises, money and/or property owned by, and/or under the custody or control of, Programs.

6.3.1   In the Medication Scheme, the Tans defrauded Programs by submitting claims to Programs falsely claiming to have provided more or different Subject Medicines to patients than, in truth, they provided.

6.3.2   The medications at issue in this case are specialized drugs referred to as "Subject Medicines." Some or all the Subject Medicines are "biological products," described by the Food and Drug Administration as "often represent[ing] the cutting-edge of biomedical research and [which], in time, may offer the most effective means to treat a variety of medical illnesses and conditions that presently have no other treatments available."[2] The Subject Medicines require regular injections and tend to be especially expensive. The Subject Medicines include: Cimzia, Stelara, Humira, Prolia, Enbrel, Kenalog, Cosentyx, Simponi, and Synvisc.

6.3.3   In the Prolonged Services Scheme, the Tans defrauded Programs by submitting claims to Programs falsely claiming to have delivered more and/or different health care benefits, items, and/or services to the patients than, in truth, they provided.

6.4   Proceeds of schemes: The Tans' schemes yielded proceeds in the form of payments from Programs.

6.5   The Defendant Property constitutes proceeds of the Tans' Medication Scheme and Prolonged Services Scheme, which are health care fraud, in violation of 18 U.S.C. § 1347.

**7   The evidence identifies approximately $9 million in proceeds of the Tans'**

---

[2] https://www.fda.gov/about-fda/center-biologics-evaluation-and-research-cber/what-are-biologics-questions-and-answers (Feb. 8, 2024)

**Medication Scheme.**

7.1   The evidence collected to date falls into two broad categories: direct evidence and analysis of business records. The direct evidence includes the disclosures by patients to law enforcement, to the effect that Dr. Tan routinely injected only one hypodermic needle into a patient's arm, when the medication required two injections for a complete dose of certain medications. It also includes undercover video (collected with the consent of the patient) corroborating the patients' disclosures. The business records include analysis of voluminous records, including those produced by the Tans, manufacturers and distributors of the Subject Medicines, Programs, and financial institutions. In general, the business records show that the Tans submitted to Programs false claims fraudulently claiming to have injected far more Subject Medicines into patients than they possibly could have, in light of the relatively small quantities of Subject Medicines that they acquired from manufacturers and distributors of those medicines.

7.2   The direct evidence shows a pattern and practice of the Tans providing less than complete doses of Subject Medication to Patients and submitting false and fraudulent claims to Programs (referred to as "billing"), thereby defrauding the Programs of millions of dollars. During this investigation, law enforcement interviewed over 24 current and former patients of Dr. Tan regarding their experiences under her care. Eight patients administered Cimzia by Dr. Tan for significant periods of time recalled the injections only involved a single syringe and a single needle stick. Multiple patients remembered Dr. Tan switching between plunger type syringes and

autoinjector syringes for their supposed Cimzia administrations. However, Cimzia is not distributed within the United States in an autoinjector format. Additionally, a typical monthly dose of Cimzia is administered through two separate injections at different sites on the patients' body. These patient recollections indicate that Dr. Tan consistently under-dosed her patients with Cimzia or provided them with different medications, yet billed their health insurance programs for full 400mg doses of Cimzia. Therefore, the Tans likely presented fraudulent claims for reimbursement to healthcare insurance programs for medications that were not provided.

7.3     Law enforcement recorded undercover video (only with the consent of patient(s)) of certain visits that Dr. Tan had with patients. That evidence shows that Dr. Tan did, in fact, inject patients with medication other than that which she claimed to have injected. Comparison of the recordings to the claims submitted by the Tans to Programs revealed multiple occasions in which Dr. Tan administered 200mg of Cimzia, yet billed the Programs for 400mg. These recorded examinations also documented multiple occasions in which Dr. Tan administered patients a completely different medication, yet falsely billed for a full dose of the medication the patients were led to believe they received. Further, the evidence indicates that Dr. Tan deceived patients regarding the identity and dose of certain medications. Accordingly, it appears that Dr. Tan did not acquire informed consent regarding at least some of the injections she performed and sought payment for.

7.4     Recordings regarding Patient-1's visits to the Clinic corroborate the patients' statements and establish an example of the health care fraud perpetuated by the Tans.

7.4.1 Law enforcement recorded, with the consent of Patient-1, five examinations at the Clinic regarding Patient-1. During the period of approximately 2012 until 2018, the Tans billed a Program for 400mg injections of Cimzia administered to Patient-1 on approximately a monthly basis. During a law enforcement interview, Patient-1 explained that all the supposed Cimzia injections performed by Dr. Tan consisted of a single syringe administered to one of his triceps. Patient-1 recalled Dr. Tan used a standard syringe for the injections on some occasions, but other times she used a pre-filled, auto-injector syringe.

7.4.2 During each recorded examination, Dr. Tan injected Patient-1 with a single syringe in his arm. On two occasions, Dr. Tan injected Patient-1 with syringes that appeared consistent with Cimzia pre-filled syringes, signifying she administered only a 200mg dose. On two other occasions, Dr. Tan injected Patient-1 with what appeared to be completely different biologic medications. During the final recorded examination, Dr. Tan injected Patient-1 with a generic syringe, which had no marking to distinguish it.

7.4.3 The Tans billed a Program for services provided to Patient-1 during the first four recorded examinations, falsely claiming to have administered 400mg of Cimzia during each visit. The Program paid the Tans $20,290 for the Cimzia. But, as observed in the recorded examinations, Dr. Tan did not inject Patient-1 with 400mg of Cimzia during any of the visits. Rather, the injections were either 200mg of Cimzia or a completely different medication. The Tans, therefore, billed the Program for medications and services they did not provide Patient-1 between

October 2018 and January 2019.

7.4.4   In October 2018, Dr. Tan injected Patient-1 with a syringe that appeared consistent with an Enbrel prefilled syringe, distributed to patients for self-injection on a weekly basis to treat rheumatoid arthritis.   In the video, Dr. Tan appeared to conceal the Enbrel syringe from Patient-1's view by using a small clipboard.   During the recording, Dr. Tan did not discuss the change in medication with Patient-1 or seek his consent. After the examination, Patient-1 told law enforcement that he believed the medication administered by Dr. Tan was Cimzia based upon the prior consent he had provided.

7.4.5   In November 2018, Dr. Tan injected Patient-1 with a syringe that appeared consistent with a Cimzia prefilled syringe.  A single Cimzia syringe contains 200mg of the medication, equivalent to a half dose under Patient-1's dosing regimen.  Dr. Tan appeared to conceal the Cimzia syringe from Patient-1's view with the same clipboard.  Prior to the injection, Patient-1 told Dr. Tan he had recently experienced painful flare ups of his rheumatoid arthritis.  Dr. Tan prescribed Patient-1 an additional oral medication and said she would consider changing his Cimzia injections if the new medication was ineffective.  Dr. Tan did not mention she would be decreasing Patient-1's Cimzia dosage or that she had provided him Enbrel the prior month.

7.4.6   In December 2018, Dr. Tan injected Patient-1 with a syringe that appeared consistent with an Orencia prefilled syringe, also distributed to patients for self-injection on a weekly basis to treat rheumatoid arthritis.  Dr. Tan did not discuss the

change in medication with Patient-1. Dr. Tan appeared to conceal the Orencia syringe from Patient-1's view with the same clipboard.

7.4.7   In January 2019, Dr. Tan injected Patient-1 with a syringe that appeared consistent with a Cimzia prefilled syringe. Dr. Tan did not mention she would be providing Patient-1 a half dose of Cimzia, or that she had provided him Orencia the prior month. Dr. Tan appeared to conceal the Cimzia syringe from Patient-1's view with the same clipboard.   After the injection, Dr. Tan provided Patient-1 with a handwritten list of his medications that he could use during appointments with other physicians. The list noted Patient-1 was administered 400mg of Cimzia every four weeks.

7.4.8   During his February 2019, examination, Patient-1 informed Dr. Tan he had experienced additional flare ups during the past month. She suggested switching Patient-1's biologic medication from Cimzia to Stelara. Dr. Tan explained that the dosing regimen for Stelara included the first injection at week zero, a second injection four weeks later, and maintenance injections every 12 weeks thereafter. Patient-1 declined to receive the Stelara, requesting to "stick with the program and let me read up on that." Dr. Tan agreed to follow Patient-1's wishes, and later in the visit injected him with a generic syringe, which had no markings to distinguish it. The average Program reimbursement for a single, 90mg subcutaneous injection of Stelara was over $18,500 at that time. Switching Patient-1's biologic medication to Stelara would have substantially increased Dr. Tan's reimbursements from the Program.

7.4.9   After the February 2019 appointment, Patient-1 told law enforcement he was able to clearly see the generic syringe after the injection because Dr. Tan left it exposed on the countertop. He noted that during prior examinations, Dr. Tan covered the syringes with her clipboard when they were sitting on the countertop.[3]

7.4.10 A review of the Tans' medical records documenting the examinations detailed above documented that Patient-1 was administered 400mg of Cimzia during each of the five visits. Additionally, Superbills documented that Patient-1 received 400mg of Cimzia and two separate injections during each visit. The recordings demonstrate Dr. Tan did not administer 400mg of Cimzia or two injections to Patient-1 during any of the visits.

7.5   Evidence regarding Patient-2 is another example of the health care fraud.

7.5.1   Law enforcement interviewed Patient-2, whose health insurance was provided by a Program. During the period of approximately 2012 until 2018, the Tans billed a Program for 400mg injections of Cimzia administered to Patient-2 on approximately a monthly basis. Patient-2 told law enforcement that all the supposed Cimzia injections performed by Dr. Tan consisted of a single syringe administered to one of her triceps.

7.5.2   During each of the three recorded examinations, Dr. Tan injected Patient-2 with a single syringe in her arm.  During the first examination, Dr. Tan injected Patient-2 with a syringe that appeared consistent with a Cimzia pre-filled syringe, signifying

---

[3] After the interview was complete, law enforcement provided Patient-1 with a DCIS commemorative coin with a value of less than $10.

that she administered only a 200mg dose. During the second and third examinations, Dr. Tan injected Patient-2 with what appeared to be completely different biologic medications.[4]

7.5.3   The Tans, nonetheless, billed the Program for services provided to Patient-2 during the first two recorded examinations, claiming they administered 400mg of Cimzia during each visit, which had not occurred. The claims associated with these injections falsely claimed (via use of the national drug code, or NDC) to have been associated with lyophilized powder Cimzia, when, in truth, the injections were with a prefilled Cimzia syringe. The distinction is material because the Program would likely have denied a claim regarding a prefilled syringe; accordingly, the falsity of the claim facilitated the Medication Scheme. The Program paid the Tans over $14,000 for the Cimzia. But, as observed in the recorded examinations, Dr. Tan did not inject Patient-2 with 400mg of Cimzia during either of the visits. Rather, the injections were either 200mg of Cimzia or a completely different medication. The Tans, therefore, billed the Program for medications and services they did not provide between October and November of 2018. The Tans billed the Program for the third recorded examination, claiming to have administered 400mg of Cimzia. However, the Program denied the claim.

7.5.4   Investigators found Medical Records and Superbills that recorded false information regarding these patient encounters. Therefore, the evidence shows the Tans created,

---

[4] After the recorded examinations were conducted, law enforcement provided Patient-2 with a souvenir DCIS commemorative coin with a value of less than $10.

or caused to be created, false records to conceal their scheme of fraudulently billing Programs for medications and injection services they did not provide.

7.6    Law enforcement acquired and analyzed business records to determine the number of false claims, submitted by the Tans, fraudulently representing that Dr. Tan had injected a patient with a Subject Medicine.

7.7    The below chart summarizes voluminous data to describe the scope of the Medication Scheme,[5] as measured by the number of Subject Medication doses per type of drug, the ratio of claims regarding each drug that are fraudulent, and the proceeds traceable:

---

[5] The chart summarizes Fraud Proceeds from the Medication Scheme through the execution of the search warrant on the Clinic in 2019, with the exception of the $649,334.92 in Fraud Proceeds from false claims submitted by the Tans for the provision of Stelara from July 9, 2019, through November 19, 2022. Law enforcement executed a search warrant at the Clinic on July 9, 2019, which is believed to be the first time the Tans learned of the criminal investigation. After the search, the Tans' purchases of Subject Medicines increased substantially. Approximately 14 days after the search, the Tans resumed purchases of Cimzia from a pharmaceutical distributor. These purchases occurred during late July 2019, totaling 12 doses of Cimzia. At the time of the search warrant, the Tans had most recently purchased Cimzia from a pharmaceutical distributor in March 2018 even though they continued to bill Programs for a significant number of doses of Cimzia. The Tans did not purchase Stelara from any pharmaceutical distributor prior to the law enforcement search of the Clinic. The Tans purchased two doses of Stelara from a pharmaceutical distributor approximately 20 days after the search. Although the Tans continued to purchase Stelara over the course of the next three years, they still did not purchase a sufficient amount to support the claims they sent to Programs for reimbursement.

Case 3:24-cv-00050-SLG    Document 1    Filed 03/01/24    Page 16 of 31

| Drug/Service Name | Units Purchased | Units Claimed | Difference | Total Reimbursements | Fraud Ratio | Fraud Proceeds |
|---|---|---|---|---|---|---|
| Cimzia | 205 | 1,756 | 1,551 | $ 6,495,572.00 | 88.3% | $ 5,737,262.06 |
| Stelara | 0 | 89 | 89 | $ 931,166.00 | 100.0% | $ 931,166.00 |
| Humira | 0 | 999 | 999 | $ 514,353.00 | 100.0% | $ 514,353.00 |
| Prolia | 9 | 156 | 147 | $ 193,746.00 | 94.2% | $ 182,568.35 |
| Enbrel | 8 | 244 | 236 | $ 72,323.00 | 96.7% | $ 69,951.75 |
| Kenalog | 64 | 959 | 895 | $ 11,341.00 | 93.3% | $ 10,584.14 |
| Cosentyx | 0 | 6 | 6 | $ 41,256.00 | 100.0% | $ 41,256.00 |
| Simponi | 1 | 8 | 7 | $ 12,807.00 | 87.5% | $ 11,206.13 |
| Synvisc | 4 | 81 | 77 | $ 40,191.00 | 95.1% | $ 38,206.26 |
| Stelara (7/9/2019 - 11/19/2022) | 57 | 111 | 54 | $ 1,334,744.00 | 48.6% | $ 649,334.92 |
| Injection Services | | | | $ 956,667.00 | 93.23% | $ 891,894.99 |
| Total Medication Fraud Scheme | | | | | | $ 9,077,783.60 |

7.7.1 "Units purchased" refers to the total number of units of a Subject Medicine that the Tans purchased for injection into patients. The evidence shows the Tans billed Programs for more Subject Medications than they purchased.

7.7.2 "Units claimed" refers to the total number of units of a Subject Medicine that the Tans billed Programs for providing to patients, per the claims that the Tans submitted to Programs.

7.7.3 "Difference" refers to how many more units of a Subject Medicine the Tans claimed to have provided to patients than units they purchased. Because it is not possible for a doctor to provide medicine to a patient that the doctor does not already possess, the Difference is a reasonably accurate measure of the number of units of medicine that the Tans falsely claimed in the Medication Scheme.

7.7.4 The evidence indicates the Tans acquired Subject Medicines from two sources other than distributors; specifically: samples provided by pharmaceutical companies, and leftover medications provided to patients. Accordingly, it is possible that the Tans actually provided more Subject Medicine to patients than law enforcement has

calculated. However, even if they did so, the Tans nevertheless committed health care fraud because the Medication Scheme would have, also, been committed by the unlawful provision of Subject Medicine to patients. Under 21 U.S.C. § 333(b)(1)(B), it is unlawful to sell a pharmaceutical sample. Further, law enforcement collected video evidence (with the consent of recorded patients) proving that Dr. Tan injected patient(s) with samples and/or leftover medications from another patient and unlawfully submitted claims to Programs for that medication. A doctor would violate 18 U.S.C. § 1347 by submitting claims falsely identifying the patient who received the medicine at issue. Accordingly, even if it were true that the Tans provided Subject Medicine to patients after acquiring that medicine as samples or leftovers, the submission of claims regarding those drugs would be a manner and means of committing the Medication Scheme.

7.7.5 Furthermore, video evidence appears to show that Dr. Tan sometimes hid from patients the true identity of the Subject Medication that she was injecting. The Subject Medications commonly use distinctive prefilled syringes and, therefore, hiding syringes from patients would have facilitated the Medication Scheme because the patient could have more easily become aware of the deception.

7.7.6 "Total Reimbursements" refers to the total funds the Tans received because of claims submitted.

7.7.7 The "Fraud Ratio" is a ratio of purchased to claimed units. A 100% fraud ratio means that all the claims regarding that medicine appear to be fraudulent.

7.7.8 "Fraud Proceeds" refers to the product of Fraud Ratio multiplied by the Total

Reimbursement. I submit that there is probable cause to believe that the Fraud Proceeds are a reasonable calculation of the value of the proceeds traceable to the Medication Scheme.

7.7.9   Accordingly, there is probable cause to believe that the proceeds of the Tans' Medication Scheme is, as of the date of signing, $9,077,783.60.

## 8   The Tans' Prolonged Services Scheme yielded approximately $1.2 million in proceeds.

8.1   In approximately March 2017, a claims processor for TRICARE notified law enforcement that the Tans billed TRICARE for prolonged services which were never rendered, and misrepresented other services such as injection administration and consultation services.

8.2   Specifically, the processor identified Dr. Tan as a high utilizer of "prolonged service" CPT codes[6] 99354 and 99355 (the "Prolonged Services CPT Codes"). These codes represent additional (or "add-on") time that a doctor spends face-to-face with a patient, in addition to the basic office visit. CPT 99354 represents an additional 60 minutes, while CPT 99355 represents each additional 30 minutes thereafter.[7] Data analysis revealed 93% of the office visit codes billed by Dr. Tan

---

[6] The Current Procedural Terminology (CPT) is a medical code set maintained by the American Medical Association (AMA). The CPT coding system consists of descriptive terms and identifying five-digit codes that are used primarily to identify medical services and procedures.

[7] Related services are assigned sequential CPT Codes with different levels of complexity. For example, the following codes apply to an office or outpatient Evaluation & Management ("E & M") visit at a physician's office for an established patient: CPT Codes

included a prolonged service add-on code.  Moreover, Dr. Tan appeared to be an outlier within her peer group and the provider that most utilized CPT 99354 and CPT 99355.

8.3    Health care fraud schemes frequently include conduct that causes an offender to become an outlier regarding CPT codes when compared to the offender's peer group.

8.4    The processor requested the Tans produce medical records regarding some patient examinations from 2012 through 2015 for which prolonged services were billed in order to conduct an audit.  The Tans provided a portion of the requested patient medical records to the processor, along with a letter of representation from an attorney.   Analysis of the audited claims by the processor revealed the Tans engaged in a pattern and practice of submitting claims asserting that Dr. Tan spent a minimum of 1 hour and 10 minutes of face-to-face time with the patient. Further, the Tans frequently billed for patient office visits involving a minimum of one hour and 55 minutes of face-to-face time between Dr. Tan and the patient.

8.5    The processor mailed survey forms to the TRICARE patients whose medical records were reviewed during the audit to determine how much time they spent with Dr. Tan for each visit. The majority of patients reported spending less than 30 minutes with Dr. Tan. Only one beneficiary reported spending over 30 minutes with Dr. Tan for each examination.

---

99211, 99212, 99213, 99214, and 99215. In this example, as the code number becomes higher, the level of service and the reimbursement increase.

8.6  Investigators conducted patient interviews, performed video recordings of patient examinations (but only with the consent of patients), subpoenaed business records, executed search warrants, and obtained data regarding claims submitted by Dr. Tan to various Programs.

8.7  The evidence collected to-date establishes probable cause that the Tans committed the Prolonged Services Scheme by submitting fraudulent claims to Programs that materially exaggerated the time that Dr. Tan spent face-to-face with patients. For example, law enforcement found during the search warrant execution of the Clinic, printed medical records, apparently created by Dr. Tan, documenting patient examination timeframes that overlapped.  A review of claims submitted to TRICARE for those patient examinations revealed the Tans did, in fact, bill for Prolonged Services for the patients whose examination times overlapped.  Therefore, Dr. Tan could not have provided the claimed amount of minimum face-to-face time.

8.8  Investigators found "improbable days," meaning days during which, in order for Dr. Tan's claimed prolonged services to be true, Dr. Tan must have seen patients for an improbable amount of time. For example, on March 5, 2013, the Tans claimed that Dr. Tan spent at least 925 minutes with 10 TRICARE patients and 185 minutes with two Veterans Affairs patients, for a total of 18.5 hours of minimum face-to-face time. On that same day, Dr. Tan claimed to have performed an additional  complex patient examination.

8.9  The Tans' contracted nurse, Nurse-1, told law enforcement that a typical patient

visit was 30 minutes long, and the longest visit was up to one hour. Further, Nurse-1 said that the Clinic was typically only open during standard business hours, with first appointments starting at 8:30 a.m. and latest appointments beginning at 5:30 p.m. Accordingly, claims alleging very long workdays appear to be fraudulent.

8.10 To summarize, the evidence establishes that claims based on the Prolonged Service CPT Codes are fraudulent because Dr. Tan routinely did not see patients face-to-face for longer than the minimum time necessary to claim reimbursement.

8.11 Accordingly, to calculate the proceeds of the Prolonged Services Scheme, investigators identified claims based on Prolonged Services CPT Codes and calculated the total value of proceeds of those claims. The following chart summarizes the proceeds:

| Drug/Service Name | Units Purchased | Units Claimed | Difference | Total Reimbursements | Fraud Ratio | Fraud Proceeds |
|---|---|---|---|---|---|---|
| Prolong Services 1st Hour | | 3,729 | | $ 863,605.00 | 100.0% | $ 863,605.00 |
| Prolong Services Addt. 30 Min. | | 1,610 | | $ 401,251.00 | 100.0% | $ 401,251.00 |
| Total Prolonged Services Fraud Scheme | | | | | | $ 1,264,856.00 |

8.12 Accordingly, the cumulative proceeds of the Medication Scheme and the Prolonged Services Scheme, which are the total proceeds of the Tans' health care fraud now known to law enforcement, is $10,342,639.60.

## 9    The Defendant Property is the proceeds traceable to the Tans' health care fraud.

9.1  Law enforcement collected and reviewed voluminous financial records to trace the proceeds of the Medication Scheme and Prolonged Services Scheme.

9.2  MD LLC is a lucrative business. Programs paid MD LLC millions of dollars because of the Tans' claims submitted as part of the Medication Scheme and Prolonged Services Scheme.

9.3  The proceeds of the Medication and Prolonged Services Schemes were deposited into the Northrim Accounts.  Investigators traced proceeds of the schemes to specific years based upon the date of service.  The Tans frequently submitted claims to Programs up to six months after the patient date of service.  Based upon the delay in submitting claims, the proceeds of the Fraud Schemes were deposited into the Northrim Accounts an average of six months later than the claimed services purportedly occurred. The evidence shows that the Tans routinely possessed Proceeds in two ways. During the first phase of the schemes (i.e., 2011-2015), the Tans received all revenue from MD LLC, including Proceeds, in Northrim Accounts #770 and #662, and periodically invested a portion of that revenue in a brokerage account at Vanguard. In approximately mid-2015, the Tans made two changes. First, they opened a third Northrim Account (i.e. #250) into which newly-acquired Proceeds were deposited; and, second, they ceased transferring Proceeds from Northrim to Vanguard. Accordingly, in the second phase of the schemes (i.e. 2015-2023) the Tans received and maintained Proceeds in Northrim #250.

9.4  Due to Northrim Bank's record-keeping practices, investigators obtained records

only as old as February 2011.

9.5    To trace funds from the first phase of the schemes (i.e. 2011-2015), investigators recognized that the Tans comingled Proceeds with "clean" funds in both the Northrim Accounts, and, also, at Vanguard.

9.5.1    The Government may trace proceeds that have been comingled with "clean" funds by calculating the ratio of proceeds to "clean" money. *United States v. Laykin*, 886 F.2d 1534, 1541 (9th Cir. 1989) ("[h]owever, we do not think the gap in the record renders the convictions invalid. Generally, when tainted and untainted funds are commingled in an account, and withdrawals are subsequently made, a proportionate share of those withdrawals will be allocated to the tainted funds," citing *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159–60 (2d Cir.1986)).

9.5.2    Investigators traced approximately $4.3 million in proceeds deposited into Northrim Accounts #770 and #662 between 2011 and June 30, 2015. Over the same time period, the total revenue deposited into Northrim Accounts #770 and #662 was approximately $8.9 million.  Proceeds constitute approximately 48% of MD LLC's revenue from 2011 to June 30, 2015. This percentage represents the "Proceeds Ratio" for funds deposited during this timeframe.  The following chart depicts the calculation of this Proceeds Ratio.

| Calculation of the Proceeds Ratio | |
| --- | --- |
| **Description** | **From 2011- June 30, 2015** |
| Total Revenue into Northrim Accounts | $         8,928,396.21 |
| Total Proceeds | $         4,301,678.59 |
| **Proceeds Ratio (Total Proceeds/Total Revenue)** | **48.18%** |

9.5.3   Between 2011 and June 30, 2015, the Tans transferred approximately $4.5 million from Northrim Accounts #770 and #662 to Vanguard Account #132.[8]  These transfers represent comingled funds, which were added to an existing account balance in Vanguard #132.  Multiplying the Proceeds Ratio by the amount the Tans transferred into Vanguard #132 from Northrim Accounts #770 and #662 results in traceable proceeds of approximately $2.1 million transferred into Vanguard #132.  The following chart depicts this tracing of proceeds to Vanguard #132.

| Calculation of Direct Proceeds Traced into Vanguard | | |
|---|---|---|
| Proceeds Ratio (Total Proceeds/Total Revenue) | | 48.18% |
| Northrim Transfers to Vanguard | $ | 4,507,247.00 |
| Direct Proceeds Traced into Vanguard (Proceeds Ratio X Northrim Transfers to Vanguard) | $ | 2,171,580.14 |

9.5.4   Accordingly, the evidence indicates that approximately $2.1 million in "direct" Proceeds were transferred to Vanguard. "Direct" Proceeds means a dollar figure corresponding to the Proceeds as calculated by a ratio of Proceeds to "clean" revenue, that the Tans deposited into Vanguard during the first phase of the

---

[8] Because of record-keeping practices at Vanguard, investigators were not able to receive account statements prior to January 1, 2012. Northrim Account #770 statements show transfers of $251,226 to Vanguard in 2011. Statements from Northrim do not specify which account at Vanguard the transfers are going to. Accordingly, investigators cannot say with complete certainty that, in 2011, the Tans transferred Proceeds directly from Northrim Account #770 to Vanguard Account #132. Nevertheless, based on the training and experience of the investigators assigned to this matter, and their knowledge of the Tans financial habits, there is probable cause to believe that this paragraph is accurate. The Tans transferred $251,226.00 to Vanguard in 2011, however Vanguard Account #132 was the only identified Vanguard account that had a balance exceeding $100,000 at the end of 2011. Additionally, from 2012 through 2015 all of the transfers from the Northrim Accounts to Vanguard were to Vanguard Account #132.

schemes.

9.5.5 In addition to the "direct" Proceeds, "indirect" Proceeds are traceable to the two schemes. "Indirect" Proceeds means the return on investment that the Tans received by investing Proceeds at Vanguard. Accordingly, to calculate indirect Proceeds, investigators reasonably approximated the Tans' rate of return, in light of their investment decisions, and multiplied that rate of return by the direct Proceeds at Vanguard.

9.5.6 Between 2011 and 2023, the balance of Vanguard Account #132 generally increased. From 2016 to 2023, the Tans transferred relatively small amounts into and out of Vanguard Account #132. Although the specific investments in Vanguard #132 changed over time, between 2016 and 2023, between 45% and 85% of the total account value was invested in two funds: VWLUX (Long-Term-Tax-Exempt Fund), and VWALX (High-Yield-Tax-Exempt Fund). Based on my training and experience, I would consider these funds to be relatively conservative in nature, and, therefore, preserve value.

9.5.7 The following chart summarizes the annual rate of return for each fund and show the average of both rates each year.

| Calculation of the Average Rate of Return for Funds VWLUX and VWALX | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Description | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| VWLUX Total return by NAV | 7.64% | -10.36% | 2.34% | 6.29% | 8.57% | 0.98% | 6.54% | 0.73% |
| VWALX Total return by NAV | 8.44% | -11.70% | 3.94% | 5.47% | 9.26% | 1.37% | 7.95% | 0.94% |
| Simple Average Yearly Rate of Return | 8.04% | -11.03% | 3.14% | 5.88% | 8.92% | 1.18% | 7.25% | 0.84% |

9.5.8 Accordingly, investigators used the average yearly rate of return regarding

VWLUX and VXALX to calculate the indirect Proceeds currently at Vanguard. Multiplying the total traceable proceeds of $2.1 million deposited into Vanguard #132 by the average yearly return rate for 2016 yields the total indirect proceeds for 2016. The sum of the direct proceeds balance in 2016 and the indirect proceeds balance in 2016 is then multiplied by the average yearly rate of return for 2017 to determine the indirect proceeds for 2017. This process, carried through to the end of 2023, results in a total amount of indirect proceeds of approximately $544,000. The below chart depicts the calculation of the indirect proceeds.

| Calculation of the Indirect Proceeds | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Description | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| Beginning of Year Proceeds Balance | $ 2,171,580.14 | $ 2,346,175.19 | $ 2,087,392.06 | $ 2,152,936.17 | $ 2,279,528.82 | $ 2,482,748.82 | $ 2,511,921.11 | $ 2,693,909.80 | |
| Simple Average Yearly Rate of Return | 8.04% | -11.03% | 3.14% | 5.88% | 8.92% | 1.18% | 7.25% | 0.84% | |
| Indirect Proceeds | $ 174,595.04 | $ (258,783.12) | $ 65,544.11 | $ 126,592.65 | $ 203,219.99 | $ 29,172.30 | $ 181,988.68 | $ 22,494.15 | $ 544,823.80 |
| End of Year Proceeds Balance | $ 2,346,175.19 | $ 2,087,392.06 | $ 2,152,936.17 | $ 2,279,528.82 | $ 2,482,748.82 | $ 2,511,921.11 | $ 2,693,909.80 | $ 2,716,403.95 | |

9.5.9 The total value of direct proceeds and indirect proceeds to be forfeited from Vanguard Account #132 is approximately $2.7 million. The following chart depicts the calculation of total funds to be forfeited from Vanguard Account #132.

| Total Funds to Seize from Vanguard | |
|---|---|
| Direct Proceeds | $ 2,171,580.14 |
| Indirect Proceeds | $ 544,823.80 |
| **Total** | **$ 2,716,403.95** |

9.6 Investigators traced about $5.8 million in proceeds deposited into Northrim Account #250 between July 1, 2015 and 2022. The following chart depicts this

tracing of proceeds to Northrim #250.

| Northrim 250 Funds Subject to Seizure | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Description | 2015 (i) | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
| Cumulative Proceeds (7/1/2015 12/31/2022) | $ 880,171.65 | $ 2,055,779.48 | $ 3,343,905.25 | $ 4,532,366.52 | $ 5,325,651.76 | $ 5,532,388.33 | $ 5,746,275.39 | $ 5,830,938.13 |
| Balance in Northrim 250 | $ 1,431,454.00 | $ 3,328,323.80 | $ 4,082,511.51 | $ 6,315,984.91 | $ 6,693,109.92 | $ 7,651,269.44 | $ 6,610,916.51 | $ 7,756,941.54 |

(i) In 2015 checks were deposited into all three Northrim accounts. For seizure purposes 2015 has been split in half. The amount of cumulative proceeds in 2015 in this chart represents proceeds received from 7/1/2015 to 12/31/2015.

9.6.1 Between July 1, 2015, and 2023, the balance of Northrim Account #250 generally increased through the deposit of comingled proceeds and other business revenue. During this timeframe, the end of year balance of Northrim Account #250 did not drop below the cumulative value of the proceeds deposited into the account.

9.7 The total funds to be arrested and forfeited from Vanguard Account #132 and Northrim Account #250 are summarized in the below chart.

| Total Funds to be Seized | |
|---|---|
| Vanguard #132 | $ 2,716,403.95 |
| Northrim #250 | $ 5,830,938.13 |
| **Total** | **$ 8,547,342.08** |

## 10 Conclusion

10.1 Based on the facts alleged above, there is probable cause to believe that the Defendant Property is proceeds of a health care fraud scheme and subject to civil forfeiture pursuant 18 U.S.C. § 981(a)(1)(C).

## 11 Request for Warrant for Arrest In Rem

11.1 Upon the filing of this complaint, the plaintiff requests that the Court issue an

arrest warrant in rem pursuant to Supplemental Rule G(3)(b), which the plaintiff will execute upon the Defendant Property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c). Because the Defendant Property is not real property and is in the government's possession, custody, or control, as it is seized in place pursuant to Seizure Warrants, the clerk must issue the warrant. Supplemental Rule G(3)(b)(i).

## 12 Claim for Relief

12.1 Plaintiff repeats and incorporates by reference the paragraphs above.

12.2 By the foregoing and other acts, there is probable cause to believe that the Defendant Property is subject to forfeiture to the United States of America under 18 U.S.C. § 981(a)(1)(C).

## 13 WHEREFORE, the United States of America prays that:

13.1 A warrant of arrest for the Defendant Property be issued;

13.2 That due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed;

13.3 That judgment be entered declaring the Defendant Property to be condemned and forfeited to the United States of America for disposition according to law;

//

//

//

//

//

13.4 And that the United States of America be granted such other and further relief as this Court may deem just and equitable, together with the costs and disbursements of this action.

RESPECTFULLY SUBMITTED this 1st day of March, 2024, in Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

s/ Seth M. Beausang
SETH M. BEAUSANG
Assistant U.S. Attorney
United States of America

**VERIFICATION**

I, Sean Boyer, hereby verify and declare under the penalty of perjury that I am a Special Agent of the Defense Criminal Investigative Service (DCIS), Department of Defense - Office of Inspector General (DoD-OIG), that I have read the foregoing Verified Complaint for Forfeiture In Rem and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief, and are based upon my personal knowledge; interviews of witnesses; review of documents and other evidence; conversations with other law enforcement personnel; and the training and experience of the assigned law enforcement personnel concerning health care fraud schemes. This complaint does not include all the facts that the law enforcement learned during the course of its investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

Executed this 1st day of March, 2024, in Seattle, Washington.

_____
Sean Boyer
DCIS Special Agent

Declarations have the same legal force as affidavits. 28 U.S.C. § 1746